Richard E. Morton (Bar No. 54188)
HAIGHT BROWN & BONESTEEL LLP
5 Hutton Centre Drive, Suite 900
Santa Ana, California 92707
Telephone:  714.754.1100
Facsimile:  714.754.0826

Attorneys for Defendant
LOS ANGELES COMMUNITY COLLEGE
DISTRICT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVIN HUEZO,<br><br>            Plaintiff,<br><br>      v.<br><br>LOS ANGELES COMMUNITY COLLEGE DISTRICT (Re:  Los Angeles Pierce College); and DOES 1-20, Inclusive,<br><br>            Defendants. | Case No. CV-04-9772 MMM/JWJx<br><br>[Assigned to Judge Hon. Margaret M. Morrow]<br><br>**DEFENDANT LOS ANGELES COMMUNITY COLLEGE DISTRICT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTIVE RELIEF; DECLARATION OF RICHARD MORTON**<br><br>[Filed and served concurrently with Declarations of Robert Garber, Michael Gibbens, Paul Nieman, Sylvia Silva, Rickey Jones, Leslee Cook, Exhibits, Objections to Declaration of Karl Danz]<br><br>Date:  June 16, 2008<br>Time:  10:00 a.m.<br>Ctrm:  780<br><br>Current Trial Date:      5/8/2007 |

Defendant  LOS  ANGELES  COMMUNITY  COLLEGE  DISTRICT ("LACCD") submits the following Opposition to Plaintiff's Motion for Permanent Injunctive Relief.

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

1

Case No. CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

# <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ................................................................2

II.   PLAINTIFF'S MOTION RELIES ON THE DECLARATION
      OF A NON-DISCLOSED EXPERT WHICH SHOULD BE
      EXCLUDED...........................................................................3

III.  LACCD HAS AND IS UTILIZING BOTH PHYSICAL
      BARRIER REMOVAL ACTIONS AND NON-STRUCTURAL
      PROGRAMMATIC SOLUTIONS TO PROVIDE ACCESS TO
      PROGRAMS, SERVICES AND ACTIVITIES ...............................4

      a.    Disabled Students Program & Services and Non-Structural
            Program Access..........................................................5

      b.    Physical Barrier Removal Programs at Pierce College.........8

IV.   THE STUDENT IS RESPONSIBLE FOR REQUESTING
      ACCOMMODATIONS AT THE COLLEGE LEVEL ................. 12

V.    CONCLUSION ............................................................... 13

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

i

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

<u>**Statutes**</u>

4

FRCP 37(c)(1)..............................................................................................................3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff MARVIN HUEZO ("HUEZO") is a 24-year-old student at Pierce College.  Pierce College is a two-year public institution and is one of the nine campuses of the Los Angeles Community College District.  Founded in 1947, Pierce College is a comprehensive college with more than 100 disciplines being taught to more than 18,000 students each semester.  The college campus is located on 427 acres in the western San Fernando Valley.  The campus setting includes 2,200 trees, thousands of rose bushes, a nature preserve and a forest area boasting giant redwoods.  (Pierce College website, http://www.piercecollege.edu/aboutgot.asp.).  Plaintiff alleges he was discriminated against by the college for failing to provide requested accommodations.

After settlement of HUEZO's monetary portion of this case at Mediation, and after entering into certain informal agreements with HUEZO'S attorney, HUEZO now moves the Court for permanent injunctive relief, specifically:

- That Defendant prepare a compliant Self Evaluation and Transition Plan;
- An Order requiring Defendant to make interim barrier removal to operate Pierce's Programs as readily accessible;
- A monitoring program for the permanent injunction.

As will be shown herein, none of the above injunctive relief is necessary.  Despite LACCD's every attempt to meet HUEZO's demands within the frame of a public institution, and after considerable expense with regard to the preparation of the compliant self evaluation and transition plans attached hereto, HUEZO now asserts that he needs a permanent injunction because "without an enforceable Court Order enjoining Defendant to comply with its obligations under Title II, Plaintiff and other similarly disabled persons will continue to be excluded and denied the benefits of defendant's programs, services and activities, including the use of safe

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

2

Case No. CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1 and accessible parking, paths of travel on campus to reach classrooms, and
2 accessible classrooms at Pierce College, in violation of Title II of the ADA."
3 (Plaintiff's Motion at Pg. 4, lns: 20-26.)

4     Plaintiff's assertion above is simply not accurate. In fact, Pierce College has
5 taken great strides to make its programs and services "readily accessible and usable
6 by" plaintiff and others (See Declarations of Robert Garber, Michael Gibbens, Paul
7 Nieman, Sylvia Silva, Rickey Jones and Leslee Cook, and exhibits attached thereto).
8 A request for a permanent injunction is superfluous and actually offensive to those
9 hard working employees of Pierce College who are working diligently not only to
10 meet the needs of HUEZO, but the needs of all those students similarly situated.

11 **II.   PLAINTIFF'S MOTION RELIES ON THE DECLARATION OF A**
12     **NON-DISCLOSED EXPERT WHICH SHOULD BE EXCLUDED.**

13     According to FRCP 37(c)(1), a party who fails properly to disclose its experts
14 and their reports may be barred from using on direct examination any expert
15 testimony not so disclosed… unless the failure to disclose was "substantially
16 justified" or "harmless." (FRCP 37(c)(1))

17     Plaintiff submits the declaration of purported path of travel expert Karl Danz
18 in support of its motion for permanent injunctive relief. Nowhere in any of
19 plaintiff's expert disclosures is Karl Danz disclosed as an expert witness for the
20 plaintiff. Accordingly, LACCD has filed the accompanying objection to the
21 Declaration of Karl Danz.

22     The court should exclude the declaration testimony of Karl Danz. Although
23 not submitted on direct examination, equitable principles mitigate in favor of
24 excluding the testimony as plaintiff failed to disclose Mr. Danz as an expert witness.
25 There is no "substantial justification" for plaintiff's failure to disclose Mr. Danz as
26 an expert as they have had ample opportunity to do so, yet failed to. Also, there is
27 no justification for submitting the declaration of non-disclosed expert Karl Danz in
28 place of disclosed expert Peter Margen, who seems to be better situated to make the

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

3

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1   declaration.  Karl Danz declaration is based on hearsay information gleaned from
2   plaintiff's disclosed expert Peter Margen.  This testimony should be excluded in its
3   entirety.

4       Further, since plaintiff has submitted the declaration testimony of a non-
5   disclosed expert, plaintiff has no standing to object to the attached declaration of
6   LACCD's expert consultant regarding ADA compliance, Michael Gibbens.

7   **III.   LACCD HAS AND IS UTILIZING BOTH PHYSICAL BARRIER**
8   **REMOVAL ACTIONS AND NON-STRUCTURAL PROGRAMMATIC**
9   **SOLUTIONS TO PROVIDE ACCESS TO PROGRAMS, SERVICES**
10  **AND ACTIVITIES**

11      In its motion for permanent injunctive relief, plaintiff attempts to paint
12  LACCD and Pierce College as being tantamount to a monster, intentionally
13  discriminating against those with disabilities and intentionally violating the
14  provisions of the ADA.  However, this is not true.  The steps LACCD has taken to
15  satisfy the injunctive relief issues and to make the Pierce College Campus ADA
16  compliant since the settlement of the plaintiff's monetary portion of the case will be
17  outlined below.  Based on these steps taken, much of the relief requested in
18  plaintiff's motion for permanent injunctive relief is rendered moot (such as the
19  request for self evaluation and transition plan), or rendered unreasonable and
20  superfluous, as LACCD has shown that it is diligently moving forward with agreed
21  to campus renovations and program changes to comply with the ADA, and thus
22  permanent injunctive relief or monitoring is unnecessary.

23      First, LACCD disputes Plaintiff's expert's reliance on the new construction
24  standards as the basis for his opinion that there are ADA "violations" on the Pierce
25  College Campus.  It is the position of Defendant that 28 CFR §35.150 is controlling.
26  The premise at issue is an existing facility and should be treated as such. (See
27  Declaration of Michael Gibbens)

28

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

4

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1  For example, many of the buildings, site improvements and grounds that are
2  now being utilized by Pierce College as a campus existed in the 1940's. (See
3  Declaration of Michael Gibbens.)  An examination of the physical characteristics of
4  these facilities makes it immediately evident that a significant portion of the campus
5  facilities existed prior to the advent of any disabled access laws or requirements to
6  construct accessible improvements, and consequently many improvements do not
7  reflect current New Construction standards for accessible buildings and facilities.
8  (See Declaration of Michael Gibbens)  It is undeniable that the Program Access
9  standard of Title II is specifically designed to address this very situation by allowing
10 for alternative methods to provide a disabled individual access to the services,
11 programs and activities in lieu of making expensive modifications to existing
12 facilities. (See Declaration of Michael Gibbens)

13     a.  **Disabled Students Program & Services and Non-Structural**
14        **Program Access.**

15 Notwithstanding the above, LACCD has undertaken necessary non-structural
16 steps to ensure program access.

17 The Los Angeles Pierce Community College Special Services Department has
18 been providing services to students with disabilities since 1974.  Known as the
19 Disabled Students Program & Services (hereinafter referred to as the "DSPS"), over
20 800 students each semester are provided with a wide range of support services to
21 enable students to fully participate in the programs, services and activities offered
22 by the College.  Examples of the types of assistance and services provided by DSPS
23 are:

- Special parking (such as providing a keycard to allow disabled students to park in both student and faculty only parking areas),

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

5

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1    - Mobility assistance, such as providing electric wheelchairs
2      for use by students, ferrying by cart and van with wheelchair
3      lift, and providing a student mobility aid,
4    - Preferred registration, including preferred registration for a
5      companion/assistant,
6    - Note taking assistance, test taking assistance,
7    - Adaptive computer equipment (JAWS, Zoomtext), talking
8      calculators, print enlargers,
9    - Adaptive physical education,
10   - Interpreting services, Brailler and Braille printer,
11   - Telecommunications devices (TTYs),
12   - Specialized English classes, specialized reading and writing
13     classes, learning disability verification,
14   - Tutoring,
15   - Other services as requested.
16   (See Declaration of Michael Gibbens)

17   Further, after the Mediation, and after the settlement before the Court on the
18   monetary issues, LACCD, at the request of the President of Pierce College,
19   endeavored to accomplish as much as it could toward a resolution of the issues
20   raised by HUEZO'S Complaint. (Declaration of Robert Garber at ¶3.)   Pierce
21   College's Special Services Student Handbook was revised as a result of the
22   Mediation in this case. (Declaration of Robert Garber at ¶4.)  A complete copy of
23   the revised Special Services Student Handbook is attached to the Declaration of
24   Robert Garber as exhibit "A." (Declaration of Robert Garber at ¶4.)  The revised
25   Special Services Student Handbook was made available to all requesting students.
26   (Declaration of Robert Garber at ¶4.)

27   After the Mediation of this case and after settlement before the Court on the
28   monetary issues, a designated ADA Coordinator was appointed and identified.  The

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

6

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1  appointed ADA Coordinator is Sylvia Silva. (Declaration of Robert Garber at ¶4;
2  Declaration of Sylvia Silva at ¶¶ 1 and 2.)

3      In furtherance of the discussions at the Mediation, a training program was put
4  in place for all instructors which included two sessions of training on ADA matters
5  before the start of each fall semester and also training on a case by case basis as
6  matters come up from time to time. (Declaration of Robert Garber at ¶6)

7      In addition to the revised Special Services Student Handbook and documents
8  appended thereto, since the settlement of the monetary portion of HUEZO'S case,
9  Pierce College has created several ADA compliant forms to ensure that it is aware
10 of a students request for accommodations. (Declaration of Sylvia Silva at ¶4.)
11 These forms include the Pierce College Accommodations Request Form,
12 Accommodations Update Form, and Los Angeles Pierce College Special Services
13 Program Authorization of Temporary Services. (Declaration of Sylvia Silva at ¶4.)
14 These forms were created to ensure that Pierce College is made aware of the
15 accommodations required for a particular disabled student.  In order to receive the
16 myriad accommodations offered by Pierce College, each qualifying student must
17 properly fill out these forms prior to the beginning of each semester. (Declaration of
18 Sylvia Silva at ¶4.)

19     The services provided by DSPS can, in many instances, provide a higher
20 degree of overall disabled accessibility to the programs, services, and activities at
21 the College that would be provided by a compliant newly-constructed disabled
22 access improvement. (Declaration of Michael Gibbens)  It is interesting to note that
23 although HUEZO complains that various improvements at Pierce College are not
24 "accessible," such as the "paths of travel" between facilities within the campus, that
25 he also admits that during the entire time he has attended Pierce College since the
26 fall of 2003, that he has been able to access every class he has enrolled in.
27 (Declaration of Michael Gibbens.)

28

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

7

Case No. CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

In light of the above, it is clear that the various services provided by DSPS, in concert with the recently made changes and revisions as outlined above after the Mediation of this matter, ensure that disabled students are able to benefit from the programs, services and activities offered at Pierce College, and that this method is effective in achieving compliance with the Program Access requirement of Section 35.150, that specifically provides for such methods in lieu of structural modifications to existing facilities.    (Declaration of Michael Gibbens.)    No permanent injunctive relief is necessary or required here.

### b.    Physical Barrier Removal Programs at Pierce College

In addition to providing access to the services, programs and activities at Pierce College by nonstructural methods, the College has a history of physical barrier removal activity to continually increase the level of overall disabled access to the facilities. (Declaration of Michael Gibbens at ¶20)  On November 22, 1993, the College District's  Board of Trustees authorized an agreement with the Blurock Partnership for architectural and engineering services to design the removal of barriers for the physically disabled at Pierce College.  On December 17, 1997, the District's Board of Trustees authorized construction for that work to be performed by LA Contractors. (Declaration of Michael Gibbens at ¶20)  The contract for this project, titled "Handicapped Barrier Removal at Los Angeles Pierce College" was dated December 18, 1997 in the amount of $1,330,000. (Declaration of Michael Gibbens at ¶20)  Additional change order documents provided indicated the overall barrier removal at Pierce College under the project exceeded $1,401,000. (Declaration of Michael Gibbens at ¶20)  In addition to this work, there was an unsolicited barrier removal project that provided 15 curb cuts within the campus was completed in 1995 in conjunction with the then acting Building & Grounds Administrator, Mr. David Bush. (Declaration of Michael Gibbens at ¶20).

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

8

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

In addition to the past barrier removal actions completed by Pierce College and since the Mediation in this matter, the following barrier removal actions have taken place:

Robert Garber and Paul Nieman of Pierce College personally met with HUEZO's ADA consultant, Peter Margen, and went over the entire campus with him so that he could address the issues that HUEZO was concerned with and wished to have alleviated by way of barrier removals. (Declaration of Robert Garber at ¶7; Declaration of Paul Nieman at ¶3)  It was agreed with Peter Margen that LACCD would await a report from Mr. Margen at which time LACCD would endeavor to address the issues that could be addressed on an immediate basis as well as those that would have to be accomplished over time and as bond money allowed. (Declaration of Robert Garber at ¶7; Declaration of Paul Nieman at ¶3)  The awaited report from Peter Margen was not provided to LACCD until six months after the initial meeting. (Declaration of Robert Garber at ¶7; Declaration of Paul Nieman at ¶3)

During those six months and beyond, LACCD endeavored to address issues that were able to be addressed. (Declaration of Paul Nieman at ¶4)  The issues identified, and the status of the corrective work to those issues is set forth in a document entitled "Attachment A to Consent Decree-Injunctive Relief." (Declaration of Paul Nieman at ¶4; A true and correct copy of Attachment A is attached to the Declaration of Paul Nieman as Exhibit "D.")  This document makes clear what issues have been identified by Mr. Margen, what corrective work is recommended, what work Pierce College will perform, and the status of that work. (Declaration of Paul Nieman at ¶4)  Many of the identified conditions are either completed, in progress, or are simply no longer in existence. (Declaration of Paul Nieman at ¶4)

Attached to the Declaration of Paul Nieman and marked as Exhibit "E," is a true and correct copy of a document entitled "Status of Identified Issues."   Mr.

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

9

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1  Nieman is the Director of College Facilities for Pierce College and prepared this
2  document on May 20, 2008, in correlation with Exhibit "D," in order to keep track
3  of the status of the ongoing corrective work to the identified issues. (Declaration of
4  Paul Nieman at ¶5)  Again, many of the identified issues are either completed or are
5  in progress. (Declaration of Paul Nieman at ¶5)   Many other issues, such as 2.9 for
6  example, will be corrected or eliminated once further on going renovations have
7  been completed. (Declaration of Paul Nieman at ¶5)  At other issues identified, at
8  3.1 for example, no corrective work is required. (Declaration of Paul Nieman at ¶5)

9      Attached to the Declaration of Paul Nieman and marked as Exhibit "F," is a
10  true and correct copy of the Pierce College Transition Plan.   Pierce College
11  contracted with ADA Accrediting Consulting on August 13, 2007, for purposes of
12  moving forward with the ADA transition plan/self-evaluation development.
13  (Declaration of Paul Nieman at ¶6)  The transition plan identifies the issues to be
14  corrected, the cost, the location, the recommended correction, and the
15  CBC/ADAAG Specification. (Declaration of Paul Nieman at ¶6)  A draft copy of
16  the same transition plan was provided to HUEZO'S attorney's on or about February
17  29, 2008. (Declaration of Paul Nieman at ¶6; Declaration of Richard Morton ¶3)

18      Attached to the Declaration of Paul Nieman and marked as Exhibit "G," is a
19  true and correct copy of the Pierce College Self Evaluation Final Draft. (Declaration
20  of Paul Nieman at ¶7)  The self evaluation was prepared by Environmental Access,
21  Inc. and ADA Accrediting and Consulting and is dated April 25, 2008. (Declaration
22  of Paul Nieman at ¶7)  Pierce College has developed this document, including all
23  attachments, to establish in written policy form its commitment to nondiscrimination
24  based on disability and to comply fully with the letter and spirit of the Americans
25  with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.
26  (Declaration of Paul Nieman at ¶7)   This document was developed by Pierce
27  College in consultation with the College's Office of College Compliance; Pierce
28  College's 504/ADA Coordinator Sylvia Silva; Environmental Access, Inc.; ADA

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

10

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1  Accrediting and Consulting. (Declaration of Paul Nieman at ¶7)  This document and

2  attachments are made public to those interested and serves as the Self-Evaluation for

3  Pierce College as defined by Title II of the Americans with Disabilities Act, Section

4  504 of the Rehabilitation Act. (Declaration of Paul Nieman at ¶7; Declaration of

5  Sylvia Silva ¶2)  Pursuant to the Pierce College ADA Implementation Timeline

6  (attached to the Declaration of Paul Nieman as Exhibit "G") the Self Evaluation

7  Plan, of which review and modifications are ongoing, will be made available for

8  public review, including HUEZO, between June 20, 2008, and August 15, 2008.

9  (Declaration of Sylvia Silva at ¶2)  Further, a copy of the final Self Evaluation will

10  be made available for review at Sylvia Silva's office located at Pierce College's

11  Office of College Compliance. (Declaration of Sylvia Silva at ¶2)

12        Accordingly, as can be seen by the actions taken by Pierce College outlined

13  above, there is no need for a permanent injunction to ensure that the required actions

14  be taken by Pierce College to comply with the ADA.  As set forth in correspondence

15  from LACCD to HUEZO, Pierce College is moving forward as quickly as they can,

16  being a public institution, to bring this matter to a resolution, after considerable

17  expense with regard to the preparation of the Self Evaluation and Transition Plans

18  attached hereto. (Declaration of Richard Morton at ¶3.)  Numerous new programs

19  and services are available for students with disabilities and there is a new bond

20  proposal containing a $17 million line item for ADA accommodations at Pierce

21  College.  This work will be completed without the need for a permanent injunction.

22  The Court is required to balance the hardships involved if it were to grant HUEZO's

23  request for a permanent injunction.  LACCD asserts that the balance of hardships

24  favors LACCD, especially in light of the DSPS and myriad of non-structural

25  program access available to students with disability, and in light of the proven

26  dedication of Pierce College to comply with the ADA through program changes and

27  barrier removal.  LACCD respectfully requests that this Court deny HUEZO'S

28  request for permanent injunctive relief.

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

11

Case No. CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

## IV.   THE   STUDENT   IS   RESPONSIBLE   FOR   REQUESTING ACCOMMODATIONS AT THE COLLEGE LEVEL

HUEZO argues in his motion that "Defendant continues to force disabled students to do its job of identifying and removing barriers." (HUEZO Motion at pg. 19, Lns 4-5.)  However, at the college level, the student must request the proper accommodations. (Declaration of Richard Morton at ¶4, See the Office of Civil Rights (OCR) decisions attached as Exhibit "L," to the Declaration of Richard Morton)

Since the resolution of the monetary part of this case, HUEZO has failed to work through the approved process to notify DSPS of his enrollment intentions and request for suitable accommodations. (Declaration of Robert Garber at ¶12; Declaration of Rickey Jones; Declaration of Leslee Cook)  Without knowing what classes he is taking and what he needs in a particular classroom, Pierce College finds it difficult to respond. (Declaration of Robert Garber at ¶12; Declaration of Rickey Jones)  Once HUEZO made his needs known, Pierce College acted quickly to provide tables and desks into the room in the location that he requested. (Declaration of Robert Garber at ¶12)  Regarding transportation, HUEZO has made request for transportation outside of the accepted process so Pierce College had to provide for him "after the fact." (Declaration of Robert Garber at ¶12; Declaration of Rickey Jones)  Pierce College had a staff member available to drive HUEZO every Thursday evening since he made the original transportation request, even though there were nights when he did not show up and provided no notice to Pierce College. (Declaration of Robert Garber at ¶12; Declaration of Rickey Jones; Declaration of Leslee Cook)

Further, there are over 180 classrooms at Pierce College.  Pierce College has set in place a feature allowing for requests for special accommodations as outlined in the Revised Special Services Handbook attached to the Declaration of Robert Garber as Exhibit "A."  However, as the OCR has made clear through numerous

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

12

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

1   rulings, the student is responsible for requesting accommodations at the college

2   level.  Once HUEZO adequately complied with the approved procedures in place to

3   request accommodations such as the accessible desk in the music room, or mobility

4   assistance to the upper portion of campus, Pierce College acted quickly and

5   passionately to assist HUEZO.  The fact that HUEZO "was recently forced to speak

6   to multiple people through days of emails," was an unfortunate side affect of

7   HUEZO'S   failure   to   follow   the   approved   procedure   to   request   such

8   accommodations.

9

10  **V.     CONCLUSION**

11        For all the reasons set forth above, defendant LACCD respectfully requests

12  this Court deny HUEZO's motion for permanent injunctive relief.

13

14  Dated: May 23, 2008                    HAIGHT BROWN & BONESTEEL LLP

15

16                                    By: _____

17                                         Richard E. Morton
                                           Attorneys for Defendant
18                                         LOS ANGELES COMMUNITY
                                           COLLEGE DISTRICT

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

13

Case No.  CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

## DECLARATION OF RICHARD MORTON

I, Richard Morton, declare:

1. I am a partner at the law firm of Haight, Brown & Bonesteel, L.L.P., counsel of record for Defendant LOS ANGELES COMMUNITY COLLEGE DISTRICT ("LACCD")in the above-captioned action. I am a member in good standing of the State Bar of California. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. Except where noted on information and belief, I have personal knowledge of the facts set forth herein and if called upon to do so, I could and would testify competently thereto under oath.

3. Attached hereto as Exhibit "K," is a true and correct copy of correspondence I sent to HUEZO's counsel dated February 29, 2008. Within this correspondence, I outlined much of the information contained in this Opposition in an effort to prevent HUEZO from filing the present unnecessary motion for permanent injunctive relief. I specifically mentioned that I had previously provided HUEZO's with a copy of the ADA Transition Plan, and updated counsel on the status of the Self-Evaluation Plan.

4. Attached hereto as Exhibit "L," is a true and correct copy of five (5) decisions of the U.S. Department of Education, Office for Civil Rights (OCR). Each of these decisions makes clear that the student is responsible for requesting accommodations at the College level.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 22, 2008, at Santa Ana, California.

_____
Richard Morton

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Orange County

LA42-0000003
3394472.1

14

Case No. CV-04-9772 MMM/JWJx
Opposition To Plaintiff's Motion for Permanent
Injunctive Relief

Exhibit "K"

# Haight Brown & Bonesteel LLP

**LAWYERS**

5 Hutton Centre Drive
Suite 900
Santa Ana, CA
92707

*tel:*  714.754.1100
*fax:*  714.754.0826

www.hbblaw.com

Richard E. Morton
*direct:*  714.754.1100
rmorton@hbblaw.com

February 29, 2008

Patricia Barbosa, Esq.
Julie McLean, Esq.
Law Offices of Paul L. Rein
200 Lakeside Drive, #A
Oakland, CA  94612

Facsimile:   510.832.4787
E-mail:      Barbosagrp@aol.com

***Privileged Settlement Communications***
***Pursuant to California Evidence Code***

> Re:   Huezo v. LACCD, et al.

Dear Ms. Barbosa:

Please accept this communication as a response to your letter dated February 15, 2008, as well as your e-mail communication of February 28, 2008, wherein you provided, as an attachment, a string of e-mails between my client and your client.

With regards to the issues Mr. Huezo has expressed relative to the architectural class, I am informed that the College's first notice that Mr. Huezo was enrolled in this class and needed a special desk was his e-mail of February 14, 2008, even though he actually knew in January that he was taking that particular class.  I am unsure as to why he waited until February 14, 2008, to request a special drafting table.  On December 21, 2007, I had forwarded to you the special services student handbook as well as accommodations request form, accommodations update form, and a Los Angeles Pierce College special services program authorization of temporary services.  These forms are provided to all special services students in the special services student handbook.  As explained on Page 7 of the handbook, there is a procedure in place for arranging for services and accommodations.

It is my understanding that the issues with regards to the drafting table have been resolved as of the date of this letter.  This was done once the College was made fully aware of all of the demands of Mr. Huezo with regards to the placement of the table, that information not being received until February 28, 2008.

In your e-mail, you have requested that Pierce College establish a policy of providing at least one fixed accessible desk, table or bench in each classroom.  As you are no doubt aware, there are 180 classrooms at Pierce College.  Pierce College has set in place a feature allowing for requests for these special accommodations as outlined in the Student Handbook and, as you are no doubt

LA42-0000003
3358197.1

Haight Brown & Bonesteel LLP

Patricia Barbosa, Esq.
February 29, 2008
Page 2

aware, the Office of Civil Rights (OCR) has made numerous rulings regarding the fact that the student is responsible for requesting accommodations at the College level.

As I have previously communicated to you, Pierce College contracted with ADA Accrediting Consulting on August 13, 2007, for purposes of moving forward with the ADA transition plan / self-evaluation development. I have, this week, provided you with the draft transition plan.

With regards to the self-evaluation plan, the contractor, an individual with disabilities, has been working diligently on preparing that self-evaluation report; however, he has not completed it as yet. Pierce College formed an advisory group consisting of staff, professionals, and disabled students for purposes of working with this contractor to put together the self-evaluation report. The College has, once again, requested that that report be completed and forwarded to the College as quickly as possible. Once even a draft of that self-evaluation report is received, it will be forwarded to you immediately.

In your letter of February 15, 2008, you also have requested that Pierce College provide you with written policy changes required for classroom setup, teacher training, shuttle services, student registration, and elevator use at the library and parking keys for staff parking. You claim that you have not received any of this information.

However, most of this information is contained within the special services student handbook. I will provide you, under separate cover, written policy changes with regards to teacher training which is not included in the handbook.

Further, I will await your proposed draft for policies relative to some of these services so that I can address those with my client. To date, I have not received those documents.

With regards to Attachment A to the Consent Decree, that has been provided to my client. They are in the process of going through that document so that I can provide you with my client's insight into the Attachment and the progress they have made toward the barrier removals outlined in the Attachment.

As you are aware, Pierce College is moving forward as quickly as they can, being a public institution, to bring this matter to resolution, after considerable expense with regards to the preparation of the self-evaluation and transition plans. It is the intent of Pierce College to do everything within its reasonable power to resolve the injunctive relief issues in an amicable fashion and will continue to work with you to that end.

Haight Brown & Bonesteel LLP

***Privileged Settlement Communications***
***Pursuant to California Evidence Code***

Patricia Barbosa, Esq.
February 29, 2008
Page 3

I await further information from you with regards to the proposed written policies and any comments you might have with regards to the content of this letter.

Very truly yours,

$\left| \leq \right|$

Richard E. Morton
Haight Brown & Bonesteel LLP

REM:lt

cc:     Robert Garber, President
        Kevin Jeter, Associate General Counsel

Exhibit "L"

1 of 1 DOCUMENT

UNIVERSITY OF SOUTH **FLORIDA**

Letter to: University of South **Florida**

**04-05-2028**

Office for Civil Rights

2005 NDLR (LRP) LEXIS 586; 33 NDLR 23

**April** 1, 2005

[*1]

The student alleged, among other things, that the university discriminated against him on the basis of his disability by failing to provide him with the appropriate accommodations for his nonstructured coursework and his Ph.D. qualifying examination. OCR disagreed. The office found that USF had policies and procedures for providing accommodations to qualified disabled students, including procedures for providing academic adjustments for nonstructured coursework. The record showed the student identified himself as an individual with a disability and requested academic adjustments from the Office of Academic Support and Accommodations for Students with Disabilities for several structured courses and exams. However, he failed to request academic adjustments from the ASASD for his nonstructured coursework or his qualifying exam. Since the student failed to follow USF's reasonable procedures for obtaining academic adjustments, OCR concluded there was insufficient evidence to support a finding that the university was not in compliance with Section 504 and Title II.

In addition, the student did not inform his Ph.D. committee members that he had a disability or request academic adjustments [*2] from them. Representatives from the ASASD and the student's Ph.D. committee members all stated that they would have provided him accommodations had he made an appropriate request.

**PANEL:** HITT

**OPINION-BY:** HITT

**OPINION:**

Dr. Judy Genshaft
President
University of South Florida
4202 East Fowler Ave., ADM 241
Tampa, Florida 33620-6150
Dear Dr. Genshaft:
Re: Complaint #04-05-2028

This letter is to notify you of the determination of the U.S. Department of Education (Department), Office for Civil Rights (OCR), regarding the above-referenced complaint filed against the University of South Florida (University). The Complainant alleged that the University discriminates on the basis of disability and retaliated against him.

As a recipient of Federal financial assistance from the Department, the University is subject to the provisions of Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. Sections 2000d et seq., and its implementing regulation, 34 C.F.R. Part 100, which prohibit discrimination on the basis of race, color, or national origin; and Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. Section 794, [*3] and its implementing regulation, 34 C.F.R. Part 104, which prohibit discrimination on the basis of disability. As a public entity, the University is also subject to the provisions of Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. Sections 12131 et

seq., and its implementing regulation, 28 C.F.R. Part 35, which prohibit discrimination on the basis of disability. Accordingly, OCR has jurisdiction over this complaint.

In investigating these issues, OCR reviewed relevant policies and procedures and other documents provided by the University. Additionally, interviews were conducted with the Complainant and faculty and staff of the University. OCR's findings and conclusions are summarized below.  Legal Standards

The regulation implementing Section 504 at 34 C.F.R Section 104.4(a) provides that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance. The regulation implementing Section 504 at 34 C.F.R. Section 104.4(b)(1)(i) [*4] provides that a recipient offering any aid, benefit, or service may not, directly or through contractual or other agreements, on the basis of disability, deny a qualified person with a disability the opportunity to participate in or benefit from the aid, benefit, or service. The regulation implementing Section 504 at 34 C.F.R. Section 104.7(b) provides that a recipient shall adopt grievance procedures that incorporate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by Section 504.

The regulation implementing Section 504 at 34 C.F.R. Section 104.43(a) provides that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic or other postsecondary education program or activity. The regulation implementing Section 504 at 34 C.F.R. 104.44(a) requires a recipient to make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of disability, against a qualified [*5] applicant or student with a disability. The Section 504 regulation at 34 C.F.R. 104.44(d)(1) provides that a recipient shall take such steps as a necessary to ensure that no student with a disability is denied the benefits of, be excluded from participation in, or otherwise subjected to discrimination because of the absence of education auxiliary aids for students with impaired sensory, manual or speaking skills. Auxiliary aids may include interpreters or the effective methods of making orally delivered materials available to students with hearing impairments. The regulations implementing Title II at 28 C.F.R. 35.107 and 35.130(a) and (b)(1)(i) also contain similar requirements.

The Section 504 regulations provide guidance on academic adjustments in postsecondary education. Under the regulations, students have a responsibility to identify their disability and request academic adjustments. Upon receipt of information that a qualified student with a disability is seeking academic adjustments, academic institutions are required to make modifications that allow a complainant to effectively participate in its programs. Effective participation in a program of study includes a reasonable [*6] effort by an academic institution to provide modifications to course requirements and to provide auxiliary aids to accommodate the specific disability identified by the complainant. The effectiveness of the modifications made by the academic institutions is evaluated based on their responsiveness to the requests raised by the complainant and whether they could provide an equal opportunity for the complainant to fully participate in the program. An academic institution is not required, however, to make changes in the essential requirements of its programs.

Disability harassment is a form of discrimination prohibited by Section 504 and Title II. Disability harassment under Section 504 and Title II is intimidation or abusive behavior toward a student based on disability that creates a hostile environment by interfering with or denying the student's participation in or receipt of benefits, services, or opportunities in the institutions program. Harassing conduct may take many forms, including verbal acts and name-calling, as well as nonverbal behavior, such as graphic and written statements, or conduct that is physically threatening, harmful, or humiliating.

Title VI and its implementing [*7] regulation at 34 C.F.R. 100.7(e) also prohibits retaliation. Specifically, the regulation states that no recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purposes of interfering with any right or privilege secured by the regulation, or because he or she has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. Allegation 1 Whether the University discriminated against the Complainant by failing to provide him the appropriate academic adjustments and/or auxiliary aids for his non-structured coursework and his qualifying exam. Findings

According to the University, the Student Support Services, currently called the Office of Academic Support and Accommodations for Students with Disabilities (ASASD), receives and processes all requests for academic adjustments for students. The University's procedures state that in order to receive accommodations and services, students are responsible for applying with the ASASD by presenting the appropriate documentation to the ASASD office; completing

an application and release form; and having the professional who [*8] conducted the evaluation complete and sign the documentation coversheet. Once accepted to receive services from ASASD, the student is responsible for registering each semester for accommodations; requesting Accommodation Letters; delivering accommodation letters to all professors; following procedures for specific accommodations and services; and monitoring his/her own academic program. The student is also responsible for renewing his or her accommodations each semester.

According to the University, the Complainant filed a complaint with the Diversity and Equal Opportunity (DEO) office in July 2004, alleging that the he was subjected to discrimination on the basis of disability because he was not provided academic adjustments in preparation for or during his qualifying exam.

According to the University, all complaints of disability discrimination are referred to the DEO. The DEO Coordinator (Coordinator) stated that all complaints of discrimination are initially reviewed through the intake process. During the intake process the assigned DEO investigator interviews the complainant and the respondent. He stated that if the respondent articulates a legitimate non-discriminatory reason [*9] for his or her actions, the Complainant is offered an opportunity to rebut. If sufficient information to refute what the respondent has stated is not provided by the complainant, the complaint will be closed during intake. If the Complainant produces sufficient information in response to the respondent's statement, the case will be investigated. The Coordinator informed OCR that witnesses are not interviewed unless a complaint is investigated. He stated that complaints accepted for review are referred to an outside agency for investigation.

According to the documentation provided by the DEO, in September 2000, the Complainant identified himself as a student with a disability and registered with the ASASD. The Complainant requested and received academic adjustments on January 29, 2002 (spring semester), September 16, 2002 and September 27, 2002 (fall semester) and summer 2003. He also requested academic adjustments for an MCAT exam in 2003. The Complainant's academic adjustments included assistance in identifying a note taker, tape recording all lectures and class discussions, use of a computer with spell check and grammar check for examinations requiring essay responses, and double [*10] time and a separate environment for examinations and quizzes.

The Complainant informed OCR that he did non-structured coursework fall 2003 and spring 2004. According to the Complainant, non-structured coursework consists of conducting independent research and reading selected material prior to taking the Ph.D. qualifying exam. He stated that he attempted to obtain academic adjustments for his non-structured coursework, but a representative from the ASASD informed him that the ASAD does not have any procedures for requesting academic adjustments for non-structured coursework. As a result, he had to do his non-structured coursework without academic adjustments. The Director of the ASASD stated that academic adjustments for non-structured coursework are requested by sending a letter of academic adjustments to the chair of the committee.

Representatives from the ASASD stated that the Complainant did not request academic adjustments for his non-structured coursework. The Director also stated that the academic adjustments available to the Complainant were not appropriate for his non-structured coursework because they were mainly to assist the Complainant with lecture settings. Documentation [*11] from the University supports that the Complainant informed the DEO investigator that he did not need reasonable accommodations memo for fall 2003 and spring 2004 because he was doing research and had no classes.

The Complainant informed OCR that in Spring 2004 he was scheduled to take his Ph.D. qualifying exam. He stated that he informed the ASASD office that he was apprehensive about requesting academic adjustments for his qualifying exam and requested assistance from the ASASD. He stated that he was told by a representative to just go in and take the test, so he took his qualifying exam without the appropriate academic adjustments. As a result, he was accused of plagiarism because he ran out of time and failed to attribute material in his outline that he obtained from a source on the Internet. However, the representative from the ASASD identified by the Complainant denies discussing the issue of academic adjustment for his non-structured coursework with the Complainant.

According to representatives from the ASASD, the Complainant did not inform them that he needed academic adjustments for his qualifying exam until July 2004, after he had taken the exam and was accused of plagiarism. [*12] The Chair of the Biology Department (Chair) also stated that the Complainant did not inform him that he needed academic adjustments for his qualifying exam until after he had failed the exam and was determined to have committed plagiarism. In addition, the Ph.D. committee members interviewed stated that the Complainant never disclosed that he was a student with a disability or that he needed academic adjustments for the exam. The committee members stated that had the Complainant identified himself as a student with a disability and requested academic adjustments, he would have been provided the appropriate academic adjustments.

In a memo provided to the DEO investigator, the Chair stated that most of the Complainant's academic adjustments were moot for the qualifying exam. The Chair explained that the qualifying exam occurs over many days, and the student is often permitted to use open books and computers (as was the case for the Complainant), and take the exam wherever he/she wants. Students are allowed from 8 am to 5 pm each day to complete the exam. The Chair stated that as a result of the structure of the qualifying exam, the academic adjustment allowing the Complainant to tape [*13] record all lectures and classroom discussions and get assistance in identifying a note taker were moot because there was no class involved. With respect to the academic adjustments allowing for the use of a computer with spell check and grammar check for examinations requiring essay responses and double time and a separate environment for examinations, the Complainant informed OCR that he used his own computer and took the exam at home. The Chair stated that the Complainant would have been provided additional time had he requested it. The DEO investigator determined that the ASASD had registered the Complainant as a qualified student with a disability; however, the Complainant did not request academic adjustments from the ASASD to take his 2004 Ph.D. qualifying examination as required by ASASD.

OCR has determined that the University has policies and procedures for providing accommodations to qualified disabled students, which includes procedures for providing academic adjustments for non-structured coursework. The Complainant appropriately identified himself as a student with a disability and requested academic adjustments from the ASASD for several structured courses and exams. [*14] However, he failed to request academic adjustments from the ASASD for his non-structured coursework or his qualifying exam. In addition, the Complainant did not inform his Ph.D. committee members that he had a disability or request academic adjustments for his non-structured coursework or qualifying exam. Representatives from the ASASD and the Complainant's Ph.D. committee members both stated that they would have provided the Complainant accommodations had he made an appropriate request. Therefore, OCR concludes that there is insufficient evidence to support a finding that the University is not in compliance with Section 504 and Title II since the Complainant failed to request academic adjustments as required for postsecondary students. Allegation 2 Whether the University discriminated against the Complainant by failing to conduct an appropriate investigation of his complaint of disability harassment and take prompt and effective remedial action after receiving notice that the incidents occurred.

The Complainant informed OCR that the Chair was his advisor and the chairman of his Ph.D. committee until Summer 2003, when he was informed that the Chair would no longer serve as his [*15] advisor or the chairman of his Ph.D. committee. The Complainant stated that the Chair teased and called him names such as "Bill Mondy Boy Scientist" because he had a disability. He also stated that the Chair would tease him about the way he spoke and wrote by saying that he used "Billbonics". The Complainant also stated that the Chair told him that his third grade teacher failed him. The Complainant stated that these comments were made on a consistent basis and in front of faculty and students. He stated that faculty and students laughed at him because of the comments made by the Chair. The Complainant also stated that he did not feel that the Chair valued him or his work because he has a disability.

The Complainant stated that after the Chair resigned as his advisor and committee chairman, he was forced to reconstruct a new committee before he could take his Ph.D. qualifying exam. The Complainant stated that he had difficulty forming a committee, as the committee members were afraid to serve on his committee because the Chair had indicated that he would not allow the Complainant to complete the program. He stated that several of his committee members were openly hostile toward [*16] him in part due to the Chair's treatment of him. He also stated that professors told him not to contact them without first making an appointment, and they criticized his writing. The Complainant stated that he was scheduled to take his Ph.D. qualifying exam in Summer 2003, but his committee cancelled his exam on the day he was to take it because they feared interference from the Chair. However, the co-chairman of the committee informed OCR that the committee decided not to move forward because none of the committee members had expertise in the research the Complainant was conducting, so they did not feel comfortable proceeding.

As previously discussed, the Complainant filed a complaint with the DEO because he took his Ph.D. qualifying exam in July 2004 without academic adjustments and was dismissed from the Ph.D. program for plagiarism. The Complainant stated that as part of his complaint, he alleged that he did not request academic adjustments for the exam because an environment had been created in the Biology Department (Department) that made him apprehensive about requesting academic adjustments. OCR found, however, that the written complaint does not specifically allege that [*17] the Complainant was subjected to harassment on the basis of disability.

The Complainant informed OCR that he discussed the negative environment in the Department with the Coordinator and verbally informed that Coordinator that he was being subjected to disability harassment. The Coordinator stated that the only issue he addressed was whether the Complainant was provided the appropriate accommodations for his qualifying exam. The Coordinator stated that although the Complainant mentioned that he was apprehensive about dis-

closing his disability, he did not specify that he was being harassed on the basis of disability. He did not discuss that issue with the Complainant because he considered the matter a side issue, since the Complainant did not elaborate. n1

The Coordinator stated that the Complainant gave him permission to speak to his clinical psychologist and representatives of the ASASD regarding the failure to accommodate him as a student with a disability. The Coordinator stated that he did not contact any of the witnesses identified by the Complainant because the Complainant's case was closed at intake. He stated that the Complainant did not provide sufficient information [*18] to refute the legitimate nondiscriminatory reason provided by the Chair, which was that he failed to request academic adjustments and plagiarized his qualifying exam.

The Chair informed OCR that he did use the term "Billbonics" towards the Complainant. He stated that he called the Complainant's writing "Billbonics" because his writing style was unique to him, in that the Complainant had his own unique sense of grammar, his own translation, and it took a bit of work determining exactly what the Complainant was trying to say. He stated that he usually used the term while the Complainant was writing his papers. He stated that he also called the Complainant "Bill Mondy Boy Scientist" and that he may have used this term in front of class and the staff. He stated that he used these terms occasionally. However, the Chair did not recall telling the Complainant that his third grade teacher failed him. He also stated that the Complainant never expressed any displeasure with the comments. Staff members interviewed by OCR stated that they never witnessed any inappropriate interaction between the Chair and the Complainant. They also described the relationship between the Complainant and the Chair [*19] as good natured and amicable. Some of the staff recalled the Chair teasing the Complainant, but they could not recall the subject of the teasing. However, they did not believe the teasing was malicious.

During an interview with OCR, the clinical psychologist who worked with the Complainant stated that he met with the Complainant every two weeks for two and a half years. He stated that the Complainant told him on more than one occasion that one of his professors mentioned that he needed special accommodations in a joking depreciating manner in front of the class. He stated that he advised the Complainant how best to handle the situation, how best to use his academic adjustments, and how to get over the difficulties he was facing because of his disability.

The Director of the ASASD also informed OCR that the Complainant verbally informed her that he was being discriminated against on the basis of disability. She stated that he also informed her that he felt he was not valued as highly as other students or as highly as he would be if he had not disclosed his disability. She stated that his belief of disability discrimination primarily related to comments and actions of the Chair. [*20] Specifically, she stated that the Complainant alleged that he did not get lab or office space equivalent to his needs. She stated that the Complainant informed her that he felt he could deal with the discrimination his way. The Director stated that if it had been an undergraduate student, she would have intervened. However, because the Complainant was a mature student, the ASASD respected his wishes not to intervene.

On July 22, 2004, the Complainant emailed the Associate Dean and stated that members in the Department and the Chair were denying him academic accommodations. He also discussed his difficulties establishing a Ph.D. committee as well as the negative way he was treated by the Chair and his Ph.D. committee members. He also stated that because of the way his committee members treated him, he was apprehensive about asking for special accommodations for fear that faculty members would no longer serve on his committee. The Complainant stated that he went to the Associate Dean to discuss the harassment he was experiencing in the Department on the basis of his disability. The Associate Dean informed OCR that he does not recall the Complainant stating that he was being harassed [*21] on the basis of disability. He stated that the issue he recalls was that the Complainant was not being provided accommodations. The Associate Dean stated that he referred the Complainant to the DEO.

The Complainant appealed the Ph.D. committee's decision to expel him from the Ph.D. program for plagiarism to the Student Grievance Committee (SGC). Documents concerning the allegations were provided to the SGC and the Interim Dean of the Office of Graduate Studies (Dean). The documents included an abstract in which the Complainant alleged that he had "a history of being abused" at the University because he had disabilities and briefly noted that his Chair had demeaned him by making inappropriate remarks about his disability, but did not provide specific examples or characterize the remarks as disability harassment. In a letter dated September 27, 2004, which was also before the Committee, the Complainant's clinical psychologist indicated that the Complainant told him that he did not request accommodations because professors had joked about his disabilities. However, the Complainant's appeal focused on the Complainant's reasons for not requesting accommodations for the exam, and did [*22] not purport to be a complaint of harassment. The SGC members interviewed, as well as the Dean, stated that they upheld the decision to expel the Complainant from the program, based on the fact that the Complainant admitted that he was making a conscious decision to

lift material from another source and include it without citation into his exam. n2 Both the Dean and the SGC members stated that they are not responsible for addressing complaints of discrimination or harassment, the DEO has this responsibility. The Dean stated that the documentation was not forwarded to the DEO because the Complainant did not allege disability harassment.

OCR has determined that although the Complainant complained to the DEO, the ASASD, and the Associate Dean about not receiving accommodations, he did not specifically allege that he was subjected to disability harassment in the Department. The Coordinator did not interview any witnesses identified by the Complainant or conduct an investigation of disability harassment because he did not consider the Complainant's statements as constituting an allegation of disability harassment. The ASASD director did not act on the Complainant's complaint because he [*23] asked her to allow him to handle the situation. The Complainant was aware of the DEO procedures for filing complaints, and there is insufficient evidence that he adequately filed a disability harassment complaint with that office, or with any University official. Therefore, OCR concludes that there is insufficient evidence to support a finding that the University is not in compliance with Section 504 and Title II since the Complainant failed to appropriately file a complaint of disability harassment. Allegation 3 Whether the University retaliated against the Complainant by not allowing him to retake his qualifying exam with accommodations after he discussed racial incidents he experienced at the University with representatives from the Sloan Foundation.

In order to determine whether retaliation occurred, OCR's retaliation analysis focused on the following elements: (1) whether the Complainant engaged in a protected activity, (2) whether the University was aware of the protected activity, (3) whether the University took adverse action against the Complainant, (4) whether there was a casual connection between the adverse action and the protected activity, and (5) whether the University [*24] can show legitimate, non-retaliatory reasons for its actions. Protected Activity and Knowledge of Protected Activity

The Complainant informed OCR that in July 2004 he participated in a panel discussion with representatives from the Sloan Foundation, which provides scholarships to minority students. He stated during the panel discussion, he informed the representatives of the racial difficulties he experienced at the University.

The Complainant stated that in July 2004 his Ph.D. committee informed him that they would allow him to retake the Ph.D. qualifying exam that he failed. However, on the day of the exam, the Chair informed him that he would not be allowed to retake his exam because he had been talking to people. He stated that the Chair indicated that it was because he spoke to the representative from the Sloan Foundation. As a result, he was not allowed to retake the exam.

Both the Chair and committee members interviewed informed OCR that they were unaware of the Complainant's participation in a panel discussion with the Sloan Foundation. They also stated that the Chair did not have any involvement with the committee, and that he did not have any input in any of the committee's [*25] decisions. The co-chair of the committee stated that the reason the Complainant was not allowed to retake his exam was because the committee determined that he committed plagiarism.

In order to establish a case of retaliation, OCR must determine that the recipient had knowledge of a protected activity, which results in an adverse action. OCR determined that there is insufficient evidence that the Chair or the committee members had knowledge that the Complainant participated in a panel discussion with the Sloan Foundation. The evidence suggests that the Complainant was not permitted to retake his qualifying exam because he was found to have committed plagiarism. Therefore, OCR concludes that there is insufficient evidence to support a finding that the University is not in compliance with Title VI since the University did not have knowledge of the Complainant's protected activity.

It should be noted that the Chair's comments to the Complainant regarding his disability are considered inappropriate. OCR recommends that the University review its disability harassment policies with faculty and staff to ensure that such as situation does not rise to the level of disability harassment. [*26] OCR also recommends that the University review with its faculty and staff its procedure for referring all complaints of discrimination to the DEO.

...

Please note that under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If we receive such a request, we will seek to protect, to the extent possible, any unwarranted invasion of privacy. In addition, intimidation or retaliation against complainants by recipients of Federal financial assistance is prohibited. No recipient may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by the laws. OCR enforces, or because one has made a complaint, or participated in any manner in an investigation in connection with a complaint.

2005 NDLR (LRP) LEXIS 586, *

This letter concludes the processing of this complaint. We appreciate your cooperation and that of your staff during the investigation. If you have any questions regarding this matter, please contact Ms. Ledondria H. Saintvil, Attorney, (404) 562-5461, or me at (404) 562-6392.

>FTNT>

n1 The Coordinator also noted that the Complainant had discussed the environment m the department with him in the past, but the Complainant had stated that he did not want to file a complaint.

n2 The Complainant denies making such an admission. >ENDFN>

[*27]

1 of 1 DOCUMENT

Copyright (c) LRP Publication 2000
National Disability Law Reporter

**University of Maryland** (MD)

Complaint No. 03-99-2031

Office for Civil Rights, Region III

1999 NDLR (LRP) LEXIS 757; 17 NDLR (LRP) 29

**March** 26, 1999, Decided

OCR received a complaint alleging that a university violated Section 504 by failing to provide academic adjustments to a student with Attention Deficit Hyperactivity Disorder and by dismissing the student from its program. HELD: for the university.

OCR's investigation revealed that the student requested accommodation less than two months before the end of the semester and that the university acted diligently in processing the request for academic adjustments. Further, OCR found the university's request for additional information as well as clarification as to the specific accommodations being requested both reasonable and timely. OCR also learned that the university approved the request for accommodation less than one week after its receipt of the requested clarification. Thus, OCR concluded that the university's approval of the request for accommodation after the end of the semester was not due to any delay on the part of the university. Therefore, OCR found no violation under Section 504 with respect to the student's request for accommodation. In light of this finding, OCR rejected the claim that had the university provided the student with the requested [*2] accommodations dismissal from the program would not have been warranted. Therefore, OCR closed the complaint.

Addressed To :
Dr. David J. RamsayPresidentUniversity of Maryland520 West Lombard StreetBaltimore, MD 21201-1627

**OPINION:**

This is to notify you of the determination of the Office for Civil Rights (OCR), U.S. Department of Education (the Department), regarding the above-referenced complaint filed by the complainant on behalf of his client, (the student), against University of Maryland (the University). Specifically, the complainant alleged that the University discriminated on the basis of disability by failing to provide his client with academic accommodations in a timely manner and by dismissing the student from the University. The complainant further alleged that the University failed to notify the student's instructors about her need for accommodations.

OCR is responsible for enforcing Section 504 of the Rehabilitation Act of 1973 (Section 504) and its implementing regulation, at 34 C.F.R. Part 104, which prohibit discrimination on the basis of disability in any program or activity receiving Federal financial assistance. OCR also has jurisdiction as a designated agency [*3] under Title II of the Americans with Disabilities Act (ADA) and its implementing regulation, at 28 C.F.R. Part 35, which prohibit discrimination against qualified individuals with disabilities by public entities. The University is a recipient of Federal financial assistance from the Department and, is a public institution of higher education, therefore, it is subject to the provisions of Section 504, the ADA, and their implementing regulations. As OCR has determined that the applicable ADA regulation does not provide greater protection than the applicable Section 504 regulation, we have applied the Section 504 standards to this complaint.

OCR has considered information provided by the complainant and the University. Based on this information, we have made the following determinations of fact.

By letter to the University dated April 8, 1998, the student's physician reported and confirmed a clinical diagnosis of the student as suffering from ADHD. The physician also recommended that the student be given various academic

accommodations. On April 13, 1998, the University, citing guidelines issued by the Maryland Disability and Higher Education Network, requested additional evidence [*4] to support the request for accommodations.

The student was evaluated by a licensed psychologist on April 10, 1998 and April 16, 1998. The results of the evaluation and recommendations for accommodations were submitted to the University by letter dated May 5, 1998. On May 27, 1998, the University requested further clarification with respect to the specific accommodations being sought by the student's psychologist. The University's request included a detailed description of its requirements for classroom courses and field placement assignments.

The student's psychologist clarified her recommendations for accommodations by letter dated May 29, 1998. On June 4, 1998, the University agreed to all the requested accommodations with the exception of those related to field placement. The University stated that it has no authority to alter the time sensitive requirements under the category of field placement, since those requirements are under the jurisdiction of each individual field placement agency.

By letter dated June 16, 1998, the University notified the student that, under faculty policy, they were required to dismiss the student from the program, due to her poor academic performance [*5] during the spring semester of 1998. They further indicated that, after a period of one year, the student could apply for re-admission to the University.

To determine whether the student is entitled to protection under Section 504, OCR first determined whether the student is a qualified individual with a disability as defined by the regulation implementing Section 504.

The regulation implementing Section 504 at 34 C.F.R. 104.3(j)(1) defines an individual with a disability as any individual who has a physical or mental impairment which substantially limits one or more major life activities. Major life activities are defined at 34 C.F.R. 104.3(j)(2)(ii) as functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

For postsecondary education programs, the regulation implementing Section 504 at 34 C.F.R. 104.3(k)(3) defines a qualified individual with a disability as an individual with a disability who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity.

OCR reviewed the report of a psychological evaluation of the student dated [*6] May 5, 1998. Based on the psychologist's findings, we find that the student suffers from Attention Deficit Hyperactivity Disorder which substantially impairs the major life activity of learning. Accordingly, the student is an individual with a disability as defined by the regulation implementing Section 504 at 34 C.F.R. 104.3(j)(1). The student is also a qualified individual with a disability as defined by the Section 504 regulation at 34 C.F.R. 104.3(k)(3), as she met the academic and technical standards requisite to admission and participation in the recipient's education program or activity when she filed her complaint with OCR.

With respect to the complainant's allegation that the University failed to provide academic accommodations in a timely manner, under the Section 504 regulation, at 34 C.F.R. 104.44, a recipient University must make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of disability, against a qualified student with a disability. It is the responsibility of the student to provide timely notice of both the disabling condition and the desire [*7] for academic adjustments. Conversely, a recipient may not unreasonably delay the implementation of such adjustments.

OCR has determined that the University acted diligently in the manner in which it processed the student's request for academic adjustments. The student's initial request was dated April 8, 1998, less than two months prior to the end of the semester The University's request for additional evidence to support the student's request, issued five days later, was both reasonable and timely, as was the University's May 27, 1998 request to the student's psychologist, for clarification regarding the specific accommodations being sought for the student. Academic adjustments were approved by the University less than one week after receiving the clarification. The fact that the approval was issued subsequent to the end of the semester was not due to any delay on the part of the University, rather, it was due to the lateness of the student's initial request for accommodations. Accordingly, OCR has determined that the evidence is insufficient to support a finding of a violation of the Section 504 regulation with respect to this issue.

The complainant further alleged that the University [*8] failed to notify the student's instructors about her need for accommodations. Even if the complainant's assertion were taken to be true, there would be no violation of the regulations enforced by OCR since the University's approval of academic adjustments for the student did not occur until after the end of the semester. Such notification would not be required until the student next registers for courses at the Uni-

versity. Accordingly, OCR has determined that the University did not violate the Section 504 regulation with respect to this issue.

The complainant also alleged that the University discriminated against the student by dismissing her. It is the complainant's contention that, had the student received academic adjustments during the course of the spring 1998 semester, her academic performance would not have warranted dismissal. For the complainant to prevail with respect to this issue, it must be shown that the University had an obligation to provide academic adjustments to the student during the semester in question. Inasmuch as OCR has already determined that the University acted reasonably and diligently in the manner in which it processed the student's request for academic [*9] adjustments, notwithstanding the fact that the accommodations were approved subsequent to the end of be semester, we find that the students dismissal was not due to discrimination on the part of the University. Accordingly, OCR has determined that the evidence is insufficient to support a finding of a violation of the Section 504 regulation with respect to this issue and we are closing our files on the matter effective the date of this letter. This letter is not intended nor should it be construed to cover any other issues under section 504 or the ADA which are not specifically discussed herein.

Please be advised that Federal regulations prohibit recipients of Federal financial assistance from taking actions which intimidate, threaten, coerce, or discriminate against individuals who exercise their statutory rights, or because they filed a complaint with OCR or taking part in the complaint resolution process.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, we will seek to protect, to the extent provided by law, personal information that, if released, could constitute [*10] an unwarranted invasion of privacy.

If you have any questions, please do not hesitate to contact Ms. Lue Perry at (215) 656-8579.  Myra Coleman Team Leader Philadelphia Office

1 of 1 DOCUMENT

Copyright (c) LRP Publication 2001
National Disability Law Reporter

**Jackson State** Univ. (MS)

Complaint No. 06-00-2024

Office for Civil Rights, Southern Division, Dallas

2000 NDLR (LRP) LEXIS 268; 19 NDLR (LRP) 167

May 11, 2000, Decided

A student with Attention Deficit Hyperactivity Disorder alleged that a university violated Section 504 of the Rehabilitation Act and Title II of the ADA by failing to provide her with academic adjustments. Specifically, the student claimed that the university's failure to provide her with accommodations for a comprehensive examination caused her to fail the examination.
HELD: for the university.
The evidence indicated that the student never requested additional time or other adjustments before taking the examination. Further, the student declined a faculty member's offer of additional time to complete the examination. In addition, the record contained a letter written by the student and addressed to the university praising the faculty for an outstanding job in putting the examination together and indicating that she had a positive experience in taking the examination. Therefore, OCR found that the evidence was insufficient to support a violation under Section 504 or Title II.

Addressed To :
Dr. Ronald Mason, Jr., PresidentJackson State University1440 J.R. Lynch St.P.O. Box 17240Jackson, MS 39217

**OPINION:**

This is to inform you that the Office for Civil Rights [*2]  (OCR) has reached a determination in the above referenced complaint filed with our office on November 15, 1999, against Jackson State University (JSU) alleging discrimination on the basis of disability, Specifically, the complainant alleged she was not provided "accommodations" (i.e., academic adjustments) for her disability, attention deficit hyperactivity disorder, and therefore, failed three parts of the comprehensive exams in the summer of 1999. This allegation was filed pursuant to Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794 (amended 1992), and its implementing regulation at 34 C.F.R. Part 104 (1999), and Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. § 12132 and its implementing regulation, at 28 C.F.R. Part 35 (1999).

Prior to initiation of the complaint investigation, OCR determined that JSU is a recipient of Federal financial assistance from the U.S. Department of Education and is also a public entity. Therefore, OCR has jurisdiction to investigate this complaint under both Section 504 and Title II.

To reach a determination with regard [*3]  to the complaint allegation, OCR reviewed information submitted by the complainant and JSU. We also interviewed the complainant and JSU representatives. We have determined that the evidence is insufficient to support a finding of a violation with respect to the complainant's allegation. The basis for our determination is summarized below.

Section 504 and Title II prohibit discrimination against qualified individuals with disabilities on the basis of disability. The implementing regulations of both define an individual with a disability as a person with a physical or mental impairment that substantially limits one or more of the major life activities of the individual. With respect to postsecondary education, the Section 504 implementing regulation defines a qualified individual with a disability as a person with a disability who meets the academic and technical standards requisite to admission or participation in the recipient's educational program or activity. The Title II implementing regulation defines a qualified individual with a dis-

ability as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, [*4] communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

The complainant is a qualified individual with a disability because she has a mental impairment, attention deficit hyperactivity disorder (ADHD), that substantially limits the major life activity of learning. She met the academic and technical standards requisite to admission or participation in the recipient's education program or activity when she was admitted to the doctoral program in Social Work at JSU for the fall of 1997.

The evidence indicates that JSU was given general notice of the types of academic adjustments/auxiliary aids recommended by the complainant's doctor in the summer of 1998. The complainant provided JSU with a statement from her doctor that states that the complainant had been diagnosed as having ADHD in 1994. The statement contains a request for "any accommodations that you might already have in place for students diagnosed with this disability." The doctor also specifically listed time and a half on tests, a quiet area [*5] for testing, preferential seating so that she is seated close to the lecturer, access to teacher notes, and access to student tutors.

The complainant transmitted the above referenced doctor's statement to the Dean of the School of Social Work and requested "reasonable accommodations to assist me in completing the Ph.D. in Social Work." The request was forwarded to the Vice President for Student Affairs, who responded to the complainant (in a letter dated July 31, 1998) indicating that a request would be made that allows her time and a half on tests, a quiet testing area and seating close to the lecturer. It was suggested that she ask a classmate to share his/her notes, and that JSU would provide NCR paper, allowing the note taker to record two or three sets of notes simultaneously. She was advised that instructors may allow taping with prior approval, and it was suggested that she attempt to identify a tutor in her major department and provide the Vice President with the person's name so the University could make arrangements to pay the individual. In closing, the complainant was invited to call the Vice President's office regarding the adjustments/aids referenced in the letter or [*6] if there was a need for additional information or clarification.

According to a letter from the director of the complainant's doctoral program to the complainant, the director and the complainant met on September 2, 1998 to discuss her needs because of her diagnosed ADHD. The letter indicates that the information in the Vice President's letter was reviewed, and that the complainant was "strongly encouraged" to inform her instructors of her condition and needs.

The complainant alleged she was not provided "accommodations" (i.e., academic adjustments) for her disability and therefore, failed three parts of the Comprehensive Examination in the summer of 1999. In her complaint letter, the complainant states that prior to taking the Comprehensive Examination in June of 1999, she went to the ADA Coordinator to ask for assistance. She stated that they (she and her classmates) had been given approximately 20 pages of questions and that this was overwhelming to her. According to the complaint letter, she asked the ADA Coordinator to ask the school to narrow the field of questions. The ADA Coordinator said she would ask, but that "schools rarely changed policy to accommodate a student." The [*7] complainant's letter also states that she asked the ADA Coordinator to remind the school of the time and a half to double time for testing recommended by her doctor. According to the complaint letter, during the testing the complainant told the director of the doctoral program that she needed more time, but was told that the test was over.

According to the ADA Coordinator, the complainant informed her that she would not need any adjustments/aids for the summer of 1999 because she would not register for classes. She informed the ADA Coordinator that if she registered for anything, it would be the Comprehensive Examination' The ADA Coordinator did state that the complainant asked if the study questions could be clarified or "broken down." She informed the complainant that the Comprehensive Examination seemed fair and that the material covered everything that she had learned in the program. The complainant told her that she would get back with her about the Comprehensive, but did not.

JSU also provided OCR a copy of a letter dated June 20, 1999, from the complainant to the Dean of the School of Social Work wherein the complainant praised the Social Work staff for the "outstanding job [*8] of putting together the comprehensive examination" for the charter doctoral class. She stated that her experience was "absolutely outstanding."

In view of the above, OCR asked the complainant specifically if she had made a request for accommodations for the Comprehensive Examination. The complainant stated she spoke with the ADA Coordinator a number of times and the ADA Coordinator stated to her that "they would do this and they would do that, if it were not a policy change." She stated that she thought she asked for accommodations for the Comprehensive Exam but guesses she did not.

2000 NDLR (LRP) LEXIS 268, *; 19 NDLR (LRP) 167

OCR's interview with the director of the doctoral program also confirmed that the complainant did not request additional time or any other academic adjustment before taking the Comprehensive Examination. The director of the doctoral program also stated that the complainant did not ask for more time while taking the exam. On the contrary, the director of the doctoral program stated that during the exam, she (the director) asked the complainant if she needed more time to complete the exam and the complainant said no.

Based on the information summarized above, OCR has determined that the evidence is insufficient [*9] to support a finding of a violation with regard to the complainant's allegation. This case is closed as of the date of this letter.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personally identifiable information, which if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Thank you for the cooperation of your staff during the investigation. If you have question, please contact me at (214) 880-2474 or Ms. Nedra Fain at (214) 880-2432.

1 of 1 DOCUMENT

**HILLSBOROUGH** COMMUNITY COLLEGE

Letter to: **Hillsborough** Community College

04-05-2029

Office for Civil Rights

2005 NDLR (LRP) LEXIS 587; 33 NDLR 24

**April 1, 2005**

[*1]

The student alleged that the college discriminated against her and other students with disabilities because instructors refused to implement accommodations authorized by the college's OSSD. OCR disagreed. It found that the college had a system in place for ensuring that students with disabilities were provided accommodations. Students were required to submit appropriate documentation to support a request for accommodations for each course to the OSSD. The OSSD then evaluated the request and supporting documentation, and issued the student a memo to give to the course instructor. In accordance with the college's policies and procedures, OSSD authorizations were not automatically guaranteed where the provision of the accommodation could result in a substantial change to the course curriculum, OCR noted. The office also found that the college regularly instructed its staff and faculty on their obligation to provide accommodations, and that it was implementing effective procedures for resolving disputes regarding student requests.

The student complained that her economics instructor for the fall 2004 semester refused to honor her accommodations. OCR found that the College's Equity [*2] Office conducted a prompt investigation of that allegation, which resulted in a remedy for the student's concerns. Additionally, the college indicated that the instructor who refused to implement the required accommodation was not granted a subsequent contract and was not rehired.

As for the student's additional allegations, OCR found no evidence that she had been denied any other authorized accommodations.

**PANEL:** SMITH

**OPINION-BY:** SMITH

**OPINION:**

Dr. Gwendolyn W. Stevenson
President
Hillsborough Community College
P.O. Box 31127
Tampa, Florida 33631-3127
Dear Dr. Stevenson:
Re: Complaint #04-05-2029

The U.S. Department of Education (Department), Office for Civil Rights (OCR), has completed its investigation of the above-referenced complaint filed against Hillsborough Community College (College). As a recipient of Federal financial assistance from the Department, the College is subject to the provisions of Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. Section 794, and its implementing regulation, 34 C.F.R. Part 104, which prohibit discrimination on the basis of disability by recipients of Federal financial assistance from the Department. [*3] As a public entity, the College is subject to Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. Sections

12131 et seq. and its implementing regulation, 28 C.F.R. Part 35, which prohibit discrimination on the basis of disability by public entities. Accordingly, OCR has jurisdiction over this complaint.

During the investigation, OCR reviewed documents provided by the Complainant and the College and conducted interviews with the Complainant and College faculty and administrators. Based on the evidence, OCR found insufficient evidence to support a finding of noncompliance regarding the allegations. Set forth below is a summary of OCR's findings and conclusions regarding the complaint.  Allegation

The complainant, [] alleged that the College discriminates against her and other students with disabilities, because instructors refuse to implement accommodations for disabilities as authorized by the College's Office of Services for Students with Disabilities (OSSD.) In support of her class allegation, the complainant stated that another instructor refused to allow a reader to assist a blind student in the class.  Applicable [*4]  Regulatory Requirements

The Section 504 regulation at 34 C.F.R. Section 104.44(a) and (d) requires a recipient to make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate, or have the effect of discriminating, on the basis of disability against a qualified applicant or student with a disability. A recipient shall take such steps as are necessary to ensure that no student with a disability is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills. The Title II implementing regulation at 28 C.F.R. Section 35.130 is construed consistently with the provisions with the Section 504 implementing regulation.  Factual Findings

The College's ADA (Americans with Disabilities Act) Policy printed in the Catalog states that the College "complies with and fully supports" Title II and Section 504. "Unless the result will cause an undue hardship to the College or fundamentally alter a program or service provided by the College, [the College] will provide reasonable accommodations [*5]  and auxiliary aids to disabled applicants, employees, students and members of the College community." The Catalog states that students or prospective students seeking accommodations must self-identify and provide appropriate documentation of the disability to the OSSD. Depending on the documentation provided, available services include, but are not limited to, sign language interpreters, readers, note takers, assistive computer hardware and software while on campus, and alternative testing arrangements.

The complainant has multiple sclerosis and applied to the OSSD for accommodations. The OSSD provided her with accommodation forms for each of her classes, including one dated August 24, 2004 for the complainant's fall 2004 Distance Learning microeconomics class. The memo provided for the following accommodations: use of a tape recorder in class, tests in Test Center only, extended time for in-class and take-home assignments, extended time for all tests, note taker service, a table to use, no penalty for disability-related absences, allow student to make up missed assignments, tests and quizzes, and allow student to take breaks.

The complainant stated that the instructor for this [*6]  class (Economics Instructor) refused to allow her to take tests in the Test Center and demanded that she take them in the classroom. She stated that, because she was unable to take the tests in the classroom, she was forced to withdraw from the class. On December 2, 2004, she filed a complaint with the College, which initiated a review by the Equity Office. The College notified her in a letter dated January 10, 2004, of its findings.

According to the letter, the complainant received the accommodations form on August 25, 2004, and placed it in the Economics Instructor's campus mailbox the same day, but he did not pick it up until October. When the complainant asked the Economics Instructor for a copy of the course syllabus, he left it in the Department office with a cover memo on it which referred to the complainant by her medical condition. The syllabus did not contain a statement inviting students with disabilities to disclose their needs for accommodations, as OSSD procedures require.

The Equity Office's letter states that the microeconomics course required five on-campus meetings, and the complainant notified the Economics Instructor that she would be unable to attend the first [*7]  meeting due to her disability. The first test was scheduled for October 15, the day of the third scheduled class meeting. The complainant contacted the Economics Instructor to find out when she could take the test in the Test Center. The Economics Instructor told her that she would have to take the test in the classroom. The OSSD Coordinator (Coordinator) attempted to contact the Economics Instructor to resolve the matter but was unsuccessful. On October 16, the complainant and the Coordinator spoke to the Vice President for Information Technology, who supervises the College's Distance Learning instruction. The complainant took the test in the Test Center the next week, but because of difficulty with the test, she requested to withdraw from the class.

The Equity Office's letter states that the College, in an effort to reach an equitable resolution to the complaint, took the following actions: granted the complainant's petition for late withdrawal, with no effect on her grade point average or financial aid status; refunded the purchase price of the course textbooks; assigned a different instructor to teach the Distance Learning Microeconomics course held an orientation with Distance [*8] Learning staff, which included training on proper syllabus statements, confidentiality of medical information and compliance with law, and effective communication between students with disabilities, faculty members, and the OSSD. Finally, because the complainant's withdrawal from the class used some of her Pell grant award, the College agreed to waive tuition for the class should she wish to retake it in the future.

The complainant confirmed that she received the letter; however, she stated that it did not resolve the allegations, because she was still having trouble getting her instructors to allow her the accommodations authorized by the OSSD. Specifically, she stated that she had to withdraw from a biology course on January 10, 2005, because she was unable to attend a class meeting. She also stated that her algebra instructor refused to allow her to turn in assignments late. She had a project due on January 30, 2005. She e-mailed the instructor that she would have to turn it in later pursuant to the accommodations form, and the instructor e-mailed back that she "had better get it in." A copy of the accommodation form provided by the College, however, shows that the complainant [*9] was allowed extended time for in-class assignments, not take-home assignments.

In an interview with OCR, The Dean of Student Services for the Dale Mabry campus stated that the complainant told him that she was having difficulty with a biology instructor not letting her waive any of the five required class meetings, and that her doctor had advised her to withdraw from the College. He said that the College allowed her to withdraw and refunded the full price of her textbooks. The Dean clarified that the biology class meetings could not be waived because it was a "blended instruction" class, combining required class meetings and distance learning. He confirmed that the class meetings were an essential component of the academic instruction. He stated that as a result of the Equity Officer's finding that the Economics Instructor violated the College's policies with regard to his treatment of the complainant, his contract was not renewed and he would not be hired again.

The Dean of Student Services stated that instructors are told to comply with the OSSD accommodation memos by their supervisors, the instructional deans, and that they receive in-service training on the services offered [*10] by the OSSD. He stated that the instructional deans tell the faculty that if a student brings them an accommodations memo, they are to comply with it as written. If the student presents a request that the instructor believes will compromise the integrity of the curriculum, the instructor should discuss it with the instructional dean and the Coordinator. The Coordinator and the instructional dean will figure out a way to meet the needs of the student and preserve the integrity of the course.

The instructional deans who were interviewed confirmed that they receive in-service training on services offered by OSSD and that they ensure that instructors receive training about the College's policies for providing accommodations. The Dean of the Associate in Arts Program for the Dale Mabry campus stated that he ensures that instructors are knowledgeable about the College's policies for providing accommodations through e-mail reminders and discussion at staff meetings.

The Dean of Student Services stated that he has occasionally received complaints from instructors regarding student requests for accommodations. If a problem reaches his level that cannot be resolved between the Coordinator [*11] and the instructor, he and the other deans work together to find an accommodation that both meets the needs of the student and conforms to the requirements of the instructor. The Dean of Student Services stated that he does not normally get involved in such matters among instructors; however, he has instructed the instructional deans to tell their faculty that they are required to comply with the accommodations forms. The instructional deans meet with their faculty every year in August for two days of orientation in the College's policies and procedures.

With regard to the allegation about the blind student, OCR interviewed the instructor who taught a reading class that the blind student incorrectly registered for. The instructor stated that this student walked into the class with her reader while she was teaching. She stated that she asked the student to wait until the class was over to discuss the registration problem, but the student immediately went to complain to the Coordinator. The Coordinator took the problem to the Dean of Student Services. The Dean of Student Services stated that he reviewed the matter and determined that the student was exempt from the course and was [*12] placed in freshman English instead.

The Dean of Student Services cited other examples of his involvement in the resolution of problems that occur with student accommodations. He stated that an instructional dean had wanted to discipline an instructor who objected to allowing a student to re-take an exam. The Dean of Student Services stated that the incident began when the student

showed up at the Test Center and there wasn't a room available. The scheduling error may have been on the part of the College or the Student, in any event, the student probably should have waited until there was a room available but insisted on taking the exam. After she received her grade for the exam, she complained about the denial of the room and requested to take it over. The instructor refused, and the instructional dean ordered the instructor to allow the Student to retake it The instructor appealed to the Dean, who made the final decision not to allow the student a "do-over." He believed it would set a bad precedent to allow a retroactive application of the accommodation, and felt that the OSSD was in error. He said that the rules operate prospectively but not retroactively. The student, of course, [*13] had the right to object to the denial of the specified accommodation, but the remedy proposed by the OSSD threatened the integrity of the course.

OCR also interviewed the Dean of the Associate in Arts Program for the Dale Mabry Campus. He stated that several students complained to him about one instructor who would not send tests to the Test Center. After he spoke to the instructor about the need to comply with accommodation forms, the instructor began placing the tests in the Test Center. He provided a copy of an e-mail memo he had written to the faculty under his supervision on January 10, 2005. In the memo, he instructed faculty members to immediately provide the accommodations specified in the OSSD accommodations form. He instructed them that if they believe the accommodations are unreasonable, they should continue the accommodations as specified and present their case for discontinuing the accommodation to the Coordinator. If the case is compelling enough to convince the Coordinator that the accommodation is unreasonable, the Coordinator will officially terminate the accommodation and inform the student and the faculty member. If the case is not compelling enough to convince [*14] the Coordinator, they are to continue the accommodations. He concluded the memo with an instruction that, when in doubt as to how to proceed with a question related to student accommodations, they should bring the matter to him for discussion and resolution.

OCR also conducted interviews with College instructors to determine any problems they have encountered regarding the provision of accommodations to students with disabilities. One instructor stated that students have not always provided her with the required forms for accommodations in a timely manner. She stated that one student sent her an e-mail 3 days before the first test, informing her that she could not come to the Test Center because of her disability. The instructor stated that she had to contact OSSD to get a response as to whether the student was in fact a person with a disability and the type of accommodations required. She stated, however, that she has never denied any student accommodations. The interviewee stated that when she has a problem, she contacts the OSSD for guidance. For this academic year, she has one student that requires accommodations.

All other instructors interviewed stated that the College provides [*15] them with training on the provision of accommodations to students with disabilities and that they are aware of the OSSD's procedures. They assured OCR that they are providing accommodations to students with disabilities that are authorized by the OSSD.  Conclusion

OCR found that the College has a system in place for ensuring that students with disabilities are provided accommodations for their disabilities. Students are required to submit appropriate documentation to support a request for accommodations for each course to the OSSD. The OSSD then evaluates the request and supporting documentation, and issues the student a memo to give to the instructor of the course in question. In accordance with the College's policies and procedures, the provision of accommodations, authorized by the OSSD, is not automatically guaranteed where the provision of such accommodation could result in a substantial change to the course curriculum. OCR also found that the College regularly instructs its employees on their obligation to provide accommodations, and the College is implementing effective procedures for resolving disputes regarding requested accommodations.

OCR found that the College's Equity [*16]  Office conducted a prompt investigation of the Complainant's allegation regarding the fall 2004 economics course, which resulted in a remedy for the Complainant's concerns. In addition, the College has indicated that the instructor who refused to implement the required accommodation was not granted a subsequent contract and would not be rehired. With regard to the additional allegations regarding the Complainant's spring 2005 courses, OCR found no evidence that the Complainant was denied an authorized accommodation. Accordingly, OCR found insufficient evidence to support a finding of noncompliance with the regulations implementing Section 504 and Title II.

The complainant may file a private suit pursuant to section 203 of the Americans with Disabilities Act, whether or not OCR finds a violation of Title II. Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records, upon request. If we receive such a request, we will seek to protect, to the extent, possible, any unwarranted invasion of privacy Intimidation or retaliation against complaints by recipients of Federal financial assistance is prohibited. No recipient may  [*17]  intimidate, threaten, coerce, or discriminate against

2005 NDLR (LRP) LEXIS 587, *

any individual for the purpose of interfering with any right or privilege secured by the laws OCR enforces, or because one has made a complaint, or participated in any manner in an investigation in connection with a complaint.

We wish to thank the College for its cooperation and assistance in resolving this complaint. If you have any questions regarding OCR's determination or this letter, please contact Phil Weltner, Attorney, at (404) 562-6371, or me, at (404) 562-6399.

1 of 1 DOCUMENT

Copyright (c) LRP Publication 1997
National Disability Law Reporter

**Edmonds** Community College (WA)

Complaint No. 10-96-2044

Office for Civil Rights, Region X

1996 NDLR (LRP) LEXIS 712; 9 NDLR (LRP) 212

**August** 7, 1996, Decided

A student with Reflex Sympathetic Dystrophy alleged that a college violated Section 504 and Title II of the ADA by failing to provide her with necessary academic adjustments for a chemistry class.

HELD: for the college.

OCR found that the college had established procedures for requesting disability-related services, and that the student did not follow them. Instead, the student did not make any request for an adjustment based on her medical condition until one hour before a scheduled quiz. In addition, although the college denied the student's request to be excused from taking the quiz at the scheduled time, it provided her an opportunity to take a make-up quiz. Thus, there was no Section 504 or ADA Title II violation.

Addressed To :
Dr. Jack O'Harah
President
Edmonds Community College
20000 68th Avenue West
Lynnwood, Washington 98036-5999

**OPINION:**

This letter is to notify you that the Office for Civil Rights (OCR) has completed its investigation of the above-referenced complaint against Edmonds Community College. In the complaint, the student alleged that the college discriminated against her on the basis of a disability by failing to provide her with  [*2]  the necessary academic adjustments during the 1995-96 academic year.

OCR conducted its investigation under the authority of section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990 which prohibit discrimination on the basis of disability in any programs or activities which receive federal financial assistance from the U.S. Department of Education and by public entities, respectively. The college is a recipient of federal financial assistance from this Department and is an entity covered by Title II.

The issue investigated was whether the college discriminated against a student on the basis of disability by failing to provide the necessary academic adjustments while she was enrolled in chemistry 101 for the fall quarter of the 1995-96 academic year. See 34 CFR 104.44(a) and 28 CFR 35.130.

With respect to the issue investigated, OCR has determined that the college is in compliance with Section 504 and Title II. Our conclusions are based on the specific findings of fact set forth below which are based in turn upon a review and analysis of written evidence, and on interviews conducted with the student, the instructor of chemistry 101,  [*3]  the division director of the math and science departments, and the college's Section 504 coordinator.

Findings of Fact

1996 NDLR (LRP) LEXIS 712, *; 9 NDLR (LRP) 212

1. The student was enrolled in chemistry 101 during the college's fall quarter 1995.

2. The college has a Services for Students with Disabilities office (SSD) which provides support and services to students with disabilities who need academic adjustments and accommodations. Information regarding the location of the office is posted in all campus buildings and descriptions of services are provided in the college's Student Handbook--Services for Students with Disabilities (Handbook) and Summer/Fall 1995 Class Schedule.

3. The policy for receiving academic adjustments and accommodations is described in the Handbook and provides a description of student responsibilities for requesting and receiving such adjustments and accommodations. Requirements include filling out a SSD registration form and an SSD written request for services, submission of evidence of a disability, and identification of adjustments/accommodations needed.

4. On November 8, 1995, an hour prior to a scheduled chemistry quiz (quiz #3), the student met with the instructor of chemistry 101 [*4] and stated that she was feeling ill due to drug therapy related to a medical condition, would fail the quiz if required to take it that day, and requested to take the quiz the next day. The student also requested to attend and participate in the lecture component of the class on that day. The instructor denied the student's request because she did not think it would be fair to other students to allow the student to attend class but not take the test all the other students were taking. The student took and failed quiz #3. It is undisputed that this was the first time the student made any request to the college for an academic adjustment.

5. It is the student's position that the instructor suggested to the student that, if she performed well on the next test (test #2), which would cover some of the same material as in quiz #3, the student could retake quiz #3. It is the instructor's position that she never told the student she might be able to retake quiz #3. It is the instructor's position that she did tell the student that if the student performed well on test #2 (in the areas covered in quiz #3) her grade for quiz #3 could be adjusted. The instructor's position is that in this same [*5] conversation she suggested that the student contact the college's SSD regarding any request for accommodation. The student denies that the instructor made such a recommendation. There were no other witnesses to this conversation, and OCR is unable to make a finding as to what the instructor said at that time.

6. It is the student's position that:

a. Between November 15 and 18, 1995, she contacted the college's Section 504 coordinator by telephone and was directed to provide the college with documentation of her disabling condition.

b. She delivered a copy of her physician's (director of Pain Management Institute at Swedish Hospital) letter dated November 15, 1995, to the SSD mailbox.

7. The physician's letter states that the student was diagnosed with Reflex Sympathetic Dystrophy and that the medications the student was taking resulted in changes in cognitive processing which could influence the speed and the process of learning, especially in the areas which require detailed memory learning such as chemistry.

8. It is the college's Section 504 coordinator's position that she could not recall communicating with the student and that the college's SSD has no record of the student's [*6] physician's letter or any record of contact with the student. Subsequent to November 15, 1995, the student did not make any inquiry or request for accommodation to either the Section 504 coordinator or SSD.

9. It is the student's position that on November 15 or 20, 1995, the instructor refused the student's request to take a November 20, 1995, chemistry test at a later date but that the instructor agreed to provide her with 45 minutes extra testing time. It is the instructor's position that she cannot recall the student requesting to postpone the taking of the November 20, 1995, test nor could she recall providing the student with extra time to take the test. There were no other witnesses to this conversation. The student received a grade of B for test #2.

10. It is the student's position that on approximately December 11, 1995, she requested to retake quiz #3 and that the instructor refused the request stating that the student's November 20, 1995, test score was not high enough. It is the instructor's position that the student's score in the areas of the test which covered the material contained in quiz #3 were not high enough to warrant an adjustment to the student's score on [*7] quiz #3. She declined to allow the student to retake quiz #3 because she had never proposed that as an option and because she did not otherwise believe there was any other reason for allowing the student to retake the quiz.

11. The student's final grade for the chemistry 101 course was 3.3 on a 4.0 scale.

12. In approximately mid-December 1995, the student's physician verbally recommended that the student travel to a warm climate to ease pain and other symptoms of her condition. During the middle or the end of March 1996, the student advised her physician that on his advice, she was going to Palm Springs, California to take advantage of the warm weather.

13. On January 8, 1996, the student met with the division director of the college's mathematics/science department to discuss a grievance against the instructor related to the instructor failing to provide the student with a postponement of the taking of quiz #3 during the fall quarter chemistry 101 course. The student informed the division director that the reason she needed to retake the quiz related to a medical problem she was having and medication she was taking. She did not provide the division director with any information [*8] indicating that she had followed the college's procedures for requesting accommodation for disability.

14. The division director discussed the situation with the class instructor and on January 11, 1996, the division director contacted the student and stated that she could take a new quiz which could substitute for quiz #3, strongly encouraged her to retake the quiz as soon as possible, and instructed her to call prior to the end of winter quarter 1996 to schedule the taking of the quiz in his office. The division director's position is that the student did not identify herself as a student with a disability requesting an accommodation on that basis and that his intervention was for the purpose of resolving a dispute between the student and the instructor.

15. The student did not contact the division director's office regarding the quiz until the week of March 11, 1996, near the end of winter quarter 1996. At that time the student informed the division director's secretary that on her physician's advice she was leaving town and requested to postpone the quiz. The division director contacted the student and refused her request to further postpone the quiz. The student made an appointment [*9] to take the make-up for quiz #3 on March 14, 1996.

16. On March 14, 1996, the student contacted the division director and stated that she was ill, was unable to take the make-up quiz on Thursday, March 14, 1996, and could not take the test on Friday, March 15, 1996, because she would be in a seminar from 8 a.m. to 5 p.m. on that day. The student told the division director that she would be traveling to Palm Springs on Monday, March 18, 1996, and requested that she be allowed to take the make-up for quiz #3 after her return. The division director denied the request because he believed she should abide by the agreement they had reached in January. Again, the student did not identify her request as a disability-related request. The student took the make-up for quiz #3 as scheduled on March 14, 1996, and did not score high enough to change her final grade.

### Analysis and Conclusion

The issue investigated was whether the college discriminated against a student on the basis of disability by failing to provide the necessary academic adjustments while she was enrolled in chemistry 101 for the fall quarter of the 1995-96 academic year.

OCR investigated this issue under the jurisdiction [*10] of Section 504 at 34 CFR 104.44(a) and Title II at 28 CFR 35.130. The regulation implementing Section 504 at 104.44(a) states that a recipient shall make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of disability, against a qualified student with a disability.

The regulation implementing Title II at 28 CFR 35.130 places requirements on public entities, such as the college, which are comparable to the above-referenced Section 504 requirements.

In order to provide the necessary academic adjustments, recipients may require students to provide evidence of the disability and to notify the appropriate personnel that such academic adjustments are necessary for the student to access a recipient's program. At the post-secondary level, Section 504 does not require recipients to provide such academic adjustments or accommodations if they are not requested by the student.

OCR found that the college has policies and procedures which set forth specific guidelines for students to follow in gaining academic adjustments and that all students were notified of these policies [*11] and procedures. The evidence did not support a finding that the student followed the established procedure for requesting SSD services. OCR found that the student did not make any request for adjustment related to a medical condition until an hour before the scheduled November 8, 1995, quiz and that the student did not present information at that time that the requested accommodation was necessary based on a disability. The student received a grade of 3.3 in the class, later obtained an opportunity to take a make-up quiz for the quiz in question, and her score on the make-up quiz was not high enough to change her grade for the class. Because the college has procedures available for requesting disability-related accommodations, and

1996 NDLR (LRP) LEXIS 712, *; 9 NDLR (LRP) 212

because the evidence does not support a finding that the student made use of such procedures, and because the information provided by the student related to her requests and her performance in the class do not support a finding that the college failed to provide the student with any adjustments or accommodation necessary for the student to benefit from the chemistry 101 class in which she was enrolled, OCR concludes that the college is in compliance with [*12] Section 504 and Title II with respect to the issue investigated.

This letter is not intended, nor should it be construed, to cover any other issues regarding compliance with Section 504 or Title II that may exist and that are not discussed herein.

You should be aware that pursuant to section 203 of Title II, the student may file a private suit irrespective of OCR's decision in this matter.

We are closing this case as of the date of this letter. Thank you for the cooperation extended to my staff during the investigation of this complaint. If you have any questions regarding this letter, please contact Mike Shapiro, equal opportunity specialist, at (206) 220-7937 or Randy Borkowski, attorney advisor, at (206) 220-7938.  Gary D. Jackson Civil Rights Enforcement Director Region X